1 | **JENNIFER L. COON**
California State Bar No. 203913
2 | **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
3 | San Diego, CA 92101-5008
(619) 234-8467/Fax: (619) 687-2666
4 | E-Mail: jennifer_coon@fd.org

5 | Attorneys for Mr. Juan Heron-Salinas

6

7

8 | UNITED STATES DISTRICT COURT

9 | SOUTHERN DISTRICT OF CALIFORNIA

10 | **(HONORABLE JEFFREY T. MILLER)**

11 | UNITED STATES OF AMERICA,      )    CASE NO. 07CR2872-JM
                                   )
12 |          Plaintiff,           )    DATE:        November 30, 2007
                                   )    TIME:        11:00 a.m.
13 | v.                            )
                                   )    STATEMENT OF FACTS AND
14 | **JUAN HERON-SALINAS,**        )    MEMORANDUM OF POINTS AND
                                   )    AUTHORITIES IN SUPPORT OF MOTIONS
15 |          Defendant.           )
    |_____)

16

17 |                              **I.**

18 |                         **BACKGROUND**

19 |        Mr. Heron-Salinas was arrested on October 9, 2007, at the San Ysidro Port of Entry.  The government

20 | alleges that Mr. Heron-Salinas was found at the port of entry, along with three other undocumented aliens,

21 | concealed inside the trunk of a vehicle.  On October 19, 2007, the government charged Mr. Heron-Salinas

22 | by way of indictment with one count of violating 8 U.S.C. § 1326 (attempted illegal re-entry after

23 | deportation).  The indictment was returned by the January 2007 grand jury.

24 |        These motions follow.

25 | //

26 | //

27 | //

28 | //

## II.

## <u>MOTION TO COMPEL DISCOVERY</u>

Mr. Heron-Salinas moves for the production of the following discovery. This request includes discovery of which the government attorney knows, and discovery of which the government attorney may become aware through the exercise of due diligence. <u>See</u> FED. R. CRIM. P. 16. It also includes all discovery listed below that is in the custody, control, care, or knowledge of any "closely related investigative [or other] agencies." <u>See</u> <u>United States v. Bryan</u>, 868 F.2d 1032 (9th Cir. 1989).

Mr. Heron-Salinas has received 69 pages of discovery and a DVD in this case. Mr. Heron-Salinas requests copies of the **audiotapes of his removal hearing(s)**. He has not yet received those tapes. He has also not received a **full copy of his A-file**. Mr. Heron-Salinas thus requests the opportunity to examine his A-file in its entirety. First, the A-file will have documentation concerning prior deportation(s). Part of Mr. Heron-Salinas's defense in this case may be that his underlying deportation was invalid. The documents in the A-file would help illuminate the validity or futility of such a defense. For example, A-file documents typically contain biographical information. Such information is essential to determining whether Mr. Heron-Salinas's deportation is invalid.

Second, the government will likely try to show, at trial, that a government officer searched the A-file and did not find an application by Mr. Heron-Salinas for permission to enter the United States. The so-called Certificate of Non-existence will state that if Mr. Heron-Salinas had applied for permission, that application would definitely be in the A-file; because an application is not in the A-file, Mr. Heron-Salinas must not have applied for permission to enter the United States. Although the certificate might be admissible, the question of how thorough the search of the A-file was is and should be open to cross-examination. <u>United States v. Sager</u>, 227 F.3d 1138, 1145 (2000) (error not to allow jury to "grade the investigation."). Mr. Heron-Salinas should be able to search his A-file to see whether an application exists. Moreover, Mr. Heron-Salinas should also be able to verify whether other documents that would ordinarily be in the A-file are "non-existent," that is, missing from his A-file. It may be a defense in this case that the government lost Mr. Heron-Salinas's application as it has other important documents.

//

//

07CR2872-JM

1      1.      The Defendant's Statements.  The government must disclose to Mr. Heron-Salinas *all* copies

2  of any written or recorded statements made by Mr. Heron-Salinas; the substance of any statements made by

3  Mr. Heron-Salinas that the government intends to offer in evidence at trial; any response by Mr. Heron-

4  Salinas to interrogation; the substance of any oral statements contained in the handwritten notes of the

5  government agent; any response to any Miranda warnings that may have been given to Mr. Heron-Salinas;

6  and any other statements by Mr. Heron-Salinas.  FED. R. CRIM. P. 16(a)(1)(A) and (B).  The Advisory

7  Committee Notes and the 1991 amendments to Rule 16 make clear that the government must reveal *all*

8  Mr. Heron-Salinas's statements, whether oral or written, regardless of whether the government intends to

9  make use of those statements.

10     2.      Arrest Reports, Notes and Tapes.  Mr. Heron-Salinas also specifically requests that all arrest

11 reports, notes, dispatch tapes, videotapes or audiotapes taken at the port of entry, or any other tapes that relate

12 to the circumstances surrounding his arrest or any questioning if such reports have not already been produced

13 *in their entirety*, be turned over to him.  This request includes, but is not limited to, any rough notes, records,

14 reports, transcripts or other documents in which statements of Mr. Heron-Salinas or any other discoverable

15 material is contained.  These documents and reports are all discoverable under Federal Rules of Criminal

16 Procedure 16(a)(1)(A) and (B) and Brady v. Maryland, 373 U.S. 83 (1963).  See also Loux v. United States,

17 389 F.2d 911 (9th Cir. 1968).  Arrest reports, investigator's notes, memos from arresting officers, dispatch

18 tapes, sworn statements, and prosecution reports pertaining to Mr. Heron-Salinas are available under Federal

19 Rules of Criminal Procedure 16(a)(1)(A) and (B), 26.2, and 12(I).  Preservation of rough notes is requested,

20 whether or not the government deems them discoverable.

21     3.      Brady Material.  Mr. Heron-Salinas requests all documents, statements, agents' reports, and

22 tangible evidence favorable to him on the issue of guilt and/or that affects the credibility of the governments'

23 case.  Impeachment and exculpatory evidence both fall within Brady's definition of evidence favorable to the

24 accused.  United States v. Bagley, 473 U.S. 667 (1985); United States v. Agurs, 427 U.S. 97 (1976).

25     4.      Any Information That May Result in a Lower Sentence.  As discussed above, any information

26 that may result in a more favorable sentence must also be disclosed pursuant to Brady, 373 U.S. 83.

27 //

28 //

07CR2872-JM

5.    <u>The Defendant's Prior Record</u>.  Evidence of a prior record is available under Federal Rule of Criminal Procedure 16(a)(1)(D).  Mr. Heron-Salinas specifically requests a complete copy of any criminal record.

6.    <u>Any Proposed 404(b) Evidence</u>.  Evidence of prior similar acts is discoverable under Federal Rule of Criminal Procedure 16(a)(1)(D) and Federal Rules of Evidence 404(b) and 609.  In addition, under Federal Rule of Evidence 404(b), "upon request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the general nature . . .." of any evidence the government proposes to introduce under Federal Rule of Evidence at trial.  Sufficient notice requires the government to "articulate *precisely* the evidential hypothesis by which a fact of consequence may be inferred from the other acts evidence."  <u>United States v. Mehrmanesh</u>, 689 F.2d 822, 830 (9th Cir. 1982) (emphasis added; internal citations omitted); <u>see also</u> <u>United States v. Brooke</u>, 4 F.3d 1480, 1483 (9th Cir. 1993) (reaffirming <u>Mehrmanesh</u> and reversing convictions).

This includes any "TECS" records as well as any other records(s) of prior border crossings (voluntary entries) that the Government intends to introduce at trial, whether in its case-in-chief, impeachment, or rebuttal.  **Mr. Heron-Salinas specifically requests any "TECS" records relating to him and/or the vehicle involved in this case.**  Although there is nothing intrinsically improper about prior border crossings, (except, as here, where there are allegations of undocumented status), they are nonetheless subject to 404(b), as they are "other acts" evidence that the government must produce before trial.  <u>United States v. Vega</u>, 188 F.3d 1150, 1154-55 (9th Cir. 1999).

Mr. Heron-Salinas requests that such notice be given *three weeks before trial* to give the defense time to adequately investigate and prepare for trial.

7.    <u>Evidence Seized</u>.  Evidence seized as a result of any search, either warrantless or with a warrant, is discoverable under Federal Rule of Criminal Procedure 16(a)(1)(E).

8.    <u>Request for Preservation of Evidence</u>.  The defense specifically requests that all dispatch tapes, videotapes or audiotapes taken at the port of entry, or any other physical evidence that may be destroyed, lost, or otherwise put out of the possession, custody, or care of the government and that relate to the arrest or the events leading to the arrest in this case be preserved.  This request includes, but is not limited to, **the results of any fingerprint analysis, the vehicle involved in this case, Mr. Heron-Salinas's personal effects, and**

1  **any evidence seized from Mr. Heron-Salinas or any third party**.  This request also includes any material

2  or percipient witnesses who might be deported or otherwise likely to become unavailable (*e.g.*, undocumented

3  aliens and transients).

4          It is requested that the prosecutor be ordered to *question* all the agencies and individuals involved in

5  the prosecution and investigation of this case to determine if such evidence exists, and if it does exist, to

6  inform those parties to preserve any such evidence.

7          9.       Henthorn Material.  Mr. Heron-Salinas requests that the Assistant United States Attorney

8  ("AUSA") assigned to this case oversee (not personally conduct) a review of all personnel files of each agent

9  involved in the present case for impeachment material.  See Kyles v. Whitley, 514 U.S. 419, 437-38 (1995)

10  (holding that "the individual prosecutor has a duty to learn of any favorable evidence known to the others

11  acting on the government's behalf in the case, including the police");  United States v. Henthorn, 931 F.2d 29

12  (9th Cir. 1991).  This request includes, but is not limited to, any complaints filed (by a member of the public,

13  by another agent, or any other person) against the agent, whether or not the investigating authority has taken

14  any action, as well as any matter for which a disciplinary review was undertaken, whether or not any

15  disciplinary action was ultimately recommended.  Mr. Heron-Salinas further requests production of any such

16  information at least *one week* prior to the motion hearing and *two weeks* prior to trial.  If the prosecutor is

17  uncertain whether certain information should be disclosed pursuant to this request, this information should

18  be produced to the Court in advance of the motion hearing and the trial for an *in camera* inspection.

19          10.      Tangible Objects.  Mr. Heron-Salinas requests the opportunity to inspect, copy, and test, as

20  necessary, all other documents and tangible objects, including photographs, books, papers, documents,

21  fingerprint analyses, vehicles, or copies of portions thereof, that are material to the defense or intended for

22  use in the government's case-in-chief or were obtained from or belong to Mr. Heron-Salinas.  FED. R. CRIM.

23  P. 16(a)(1)(E).

24          11.      Expert Witnesses.  Mr. Heron-Salinas requests the name, qualifications, and a written summary

25  of the testimony of any person that the government intends to call as an expert witness during its case in chief.

26  FED. R. CRIM. P. 16(a)(1)(G).  This summary should include a description of the witness' opinion(s), as well

27  as the basis and the reasons for the opinion(s).  See United States v. Duvall, 272 F.3d 825 (7th Cir. 2001)

28  (finding that government's written expert notice did not adequately summarize or describe police detective's

1    testimony in drug prosecution where notice provided only a list of the general subject matters to be covered

2    and failed to identify what opinion the expert would offer on those subjects).  This request includes, but is

3    not limited to, disclosure of the qualifications of any government witness who will testify that he understands

4    and/or speaks Spanish or any other foreign language that may have been used during the course of an

5    interview with Mr. Heron-Salinas or any other witness.

6         Mr. Heron-Salinas requests the notice of expert testimony be provided at a minimum of *three weeks*

7    *prior to trial* so that the defense can properly prepare to address and respond to this testimony, including

8    obtaining its own expert and/or investigating the opinions, credentials of the government's expert and obtain

9    a hearing in advance of trial to determine the admissibility of qualifications of any expert.  See Kumho

10   Tire Co. v. Carmichael, 526 U.S. 137, 119 S. Ct. 1167, 1176 (1999) (trial judge is "gatekeeper" and must

11   determine, reliability and relevancy of expert testimony and such determination may require "special briefing

12   or other proceedings")

13        12.    Impeachment Evidence.  Mr. Heron-Salinas requests any evidence that any prospective

14   government witness has engaged in any criminal act whether or not resulting in a conviction and whether any

15   witness has made a statement favorable to Mr. Heron-Salinas.  See Federal Rules of Evidence 608, 609 and

16   613.  Such evidence is discoverable under Brady, 373 U.S. 83.  See United States v. Strifler, 851 F.2d 1197

17   (9th Cir. 1988) (witness' prior record); Thomas v. United States, 343 F.2d 49 (9th Cir. 1965) (evidence that

18   detracts from a witness' credibility). **Specifically, Mr. Heron-Salinas requests any evidence regarding the**

19   **material witnesses' prior record; prior criminal acts; and any other impeaching information.**

20   **Mr. Heron-Salinas also requests an opportunity to view the material witnesses' A-Files.  In the**

21   **alternative, Mr. Heron-Salinas requests that the Court conduct an *in camera* review of the A-Files to**

22   **determine if any Brady or impeachment information exists.**

23        13.    Evidence of Criminal Investigation of Any Government Witness.  Mr. Heron-Salinas requests

24   any evidence that any prospective witness is under investigation by federal, state or local authorities for any

25   criminal conduct.  United States v. Chitty, 760 F.2d 425 (2d Cir. 1985).

26        14.    Evidence of Bias or Motive to Lie.  Mr. Heron-Salinas requests any evidence that any

27   prospective government witness is biased or prejudiced against Mr. Heron-Salinas, or has a motive to falsify

28   or distort his or her testimony. Pennsylvania v. Ritchie, 480 U.S. 39 (1987); Strifler, 851 F.2d 1197.  **To this**

1  **end, Mr. Heron-Salinas requests discovery regarding all of the material witnesses' prior border**

2  **apprehensions/contacts and any other potential impeachment information regarding these witnesses.**

3      15.    <u>Evidence Affecting Perception, Recollection, Ability to Communicate, or Veracity</u>.

4  Mr. Heron-Salinas requests any evidence, including any medical or psychiatric report or evaluation, tending

5  to show that any prospective witness' ability to perceive, remember, communicate, or tell the truth is

6  impaired; and any evidence that a witness has ever used narcotics or other controlled substance, or has ever

7  been an alcoholic. <u>Strifler</u>, 851 F.2d 1197; <u>Chavis v. North Carolina</u>, 637 F.2d 213, 224 (4th Cir. 1980).

8      16.    <u>Witness Addresses</u>.  Mr. Heron-Salinas requests the name and last known address of each

9  prospective government witness. <u>See</u> <u>United States v. Napue</u>, 834 F.2d 1311 (7th Cir. 1987); <u>United States</u>

10 <u>v. Tucker</u>, 716 F.2d 576 (9th Cir. 1983) (failure to interview government witnesses by counsel is ineffective);

11 <u>United States v. Cook</u>, 608 F.2d 1175, 1181 (9th Cir. 1979) (defense has equal right to talk to witnesses).

12 Mr. Heron-Salinas also requests the name and last known address of every witness to the crime or crimes

13 charged (or any of the overt acts committed in furtherance thereof) who will *not* be called as a government

14 witness, **including but not limited to the driver and all other occupants of the car in which Mr. Heron-**

15 **Salinas was allegedly found concealed.**  <u>United States v. Cadet</u>, 727 F.2d 1453 (9th Cir. 1984).

16     17.    <u>Name of Witnesses Favorable to the Defendant</u>.  Mr. Heron-Salinas requests the name of any

17 witness who made any arguably favorable statement concerning Mr. Heron-Salinas or who could not identify

18 him or who was unsure of his identity or participation in the crime charged. <u>Jackson v. Wainwright</u>, 390 F.2d

19 288 (5th Cir. 1968); <u>Chavis</u>, 637 F.2d at 223; <u>Jones v. Jago</u>, 575 F.2d 1164, 1168 (6th Cir. 1978); <u>Hudson v.</u>

20 <u>Blackburn</u>, 601 F.2d 785 (5th Cir. 1979), <u>cert. denied</u>, 444 U.S. 1086 (1980).

21     18.    <u>Statements Relevant to the Defense</u>.  Mr. Heron-Salinas requests disclosure of any statements

22 that may be "relevant to any possible defense or contention" that he might assert. <u>United States v. Bailleaux</u>,

23 685 F.2d 1105 (9th Cir. 1982). **This includes grand jury transcripts that are relevant to the defense**

24 **motion to dismiss the indictment.**

25     19.    <u>Jencks Act Material</u>.  Mr. Heron-Salinas requests production in advance of the motion hearing

26 or trial of all material, including dispatch tapes, that the government must produce pursuant to the Jencks Act,

27 18 U.S.C. § 3500 and Federal Rule of Criminal Procedure 26.2.  A verbal acknowledgment that "rough" notes

28 constitute an accurate account of the witness' interview is sufficient for the report or notes to qualify as a

1  statement under 3500(e)(1). Campbell v. United States, 373 U.S. 487, 490-92 (1963); see also United States

2  v. Boshell, 952 F.2d 1101 (9th Cir. 1991) (holding that interview notes constitute Jencks material when an

3  agent reviews notes with the subject of the interview); see also United States v. Riley, 189 F.3d 802, 806-08

4  (9th Cir. 1999). Advance production will avoid the possibility of delay of the motion hearing or trial to allow

5  Mr. Heron-Salinas to investigate the Jencks material. Mr. Heron-Salinas requests pre-trial disclosure of such

6  statements to avoid unnecessary recesses and delays and to allow defense counsel to prepare for, and use

7  properly any Jencks statements during cross-examination.

8      20.  Giglio Information.  Pursuant to Giglio v. United States, 405 U.S. 150 (1972), Mr. Heron-

9  Salinas requests all statements and/or promises, expressed or implied, made to any government witnesses,

10  in exchange for their testimony in this case, and all other information that could arguably be used for the

11  impeachment of any government witnesses.

12      21.  Agreements Between the Government and Witnesses. Mr. Heron-Salinas requests discovery

13  regarding any express or implicit promise, understanding, offer of immunity, of past, present, or future

14  compensation, or any other kind of agreement or understanding, including any implicit understanding relating

15  to criminal or civil income tax, forfeiture or fine liability, between any prospective government witness and

16  the government (federal, state and/or local).  This request also includes any discussion with a potential

17  witness about or advice concerning any immigration benefits, any contemplated prosecution, or any possible

18  plea bargain, even if no bargain was made or the advice not followed.

19      22.  Informants and Cooperating Witnesses. Mr. Heron-Salinas requests disclosure of the names

20  and addresses of all informants or cooperating witnesses used or to be used in this case, and in particular,

21  disclosure of any informant who was a percipient witness in this case or otherwise participated in the crime

22  charged against Mr. Heron-Salinas.  The government must disclose the informant's identity and location, as

23  well as disclose the existence of any other percipient witness unknown or unknowable to the defense.

24  Roviaro v. United States, 353 U.S. 53, 61-62 (1957). The government must disclose any information derived

25  from informants that exculpates or tends to exculpate Mr. Heron-Salinas.

26      23.  Bias by Informants or Cooperating Witnesses. Mr. Heron-Salinas requests disclosure of any

27  information indicating bias on the part of any informant or cooperating witness. Giglio, 405 U.S. 150. Such

28

1  information would include what, if any, inducement, favors, payments, or threats were made to witness to

2  secure cooperation with the authorities.

3          24.    Personnel Records of Government Officers Involved in the Arrest. Mr. Heron-Salinas requests

4  all citizen complaints and other related internal affairs documents involving any of the immigration officers

5  or other law enforcement officers who were involved in the investigation, arrest and interrogation of

6  Mr. Heron-Salinas.  See Pitchess v. Superior Court, 11 Cal.3d 531, 539 (1974).  Because of the sensitive

7  nature of these documents, defense counsel will be unable to procure them from any other source.

8          25.    Reports of Scientific Tests or Examinations.    Pursuant to Federal Rule of

9  Criminal Procedure 16(a)(1)(F), Mr. Heron-Salinas requests the reports of all tests and examinations

10 conducted upon the evidence in this case, including, but not limited to, any fingerprint testing done upon any

11 evidence seized in this case, that is within the possession, custody, or control of the government, the existence

12 of which is known, or by the exercise of due diligence may become known, to the attorney for the

13 government, and that are material to the preparation of the defense or are intended for use by the government

14 as evidence in chief at the trial.

15         26.    Residual Request. Mr. Heron-Salinas intends by this discovery  motion to invoke his rights

16 to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution

17 and laws of the United States.  This request specifically includes all subsections of Federal Rule of

18 Criminal Procedure 16.

19         Mr. Heron-Salinas requests that the government provide him and his attorney with the above requested

20 material sufficiently in advance of trial.

21                                        **III.**

22 **THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'S
   INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN

23 AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE FIFTH
   AMENDMENT BY DEPRIVING MR. HERON-SALINAS OF THE TRADITIONAL

24 FUNCTIONING OF THE GRAND JURY**

25 **A.    Introduction.**

26        The indictment in the instant case was returned by the January 2007 grand jury.  That grand jury was

27 instructed by the Honorable Larry A. Burns, United States District Court Judge on January 11, 2007.  See

28 Reporter's Partial Transcript of the Proceedings, dated January 11, 2007, a copy of which is attached hereto

1   as Exhibit A.  Judge Burns's instructions to the impaneled grand jury deviate from the instructions at issue

2   in the major Ninth Circuit cases challenging a form grand jury instruction previously given in this district in

3   several ways.[1]  These instructions compounded Judge Burns's erroneous instructions and comments to

4   prospective grand jurors during voir dire of the grand jury panel, which immediately preceded the instructions

5   at Ex. A.  See Reporter's Transcript of Proceedings, dated January 11, 2007, a copy of which is attached

6   hereto as Exhibit B.[2]

7       **1.    Judge Burns Instructed Grand Jurors That Their Singular Duty Is to
            Determine Whether or Not Probable Cause Exists and That They Have
8           No Right to Decline to Indict When the Probable Cause Standard Is
            Satisfied.**

9

10      After repeatedly emphasizing to the grand jurors that probable cause determination was their sole

11  responsibility, see Ex. A at 3, 3-4, 5,[3] Judge Burns instructed the grand jurors that they were forbidden "from

12  judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a

13  federal law or should not be a federal law designating certain activity [as] criminal is not up to you."  See id.

14  at 8.  The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that

15  judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even

16  though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may

17  be insufficient.'"  See id. at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict

18  because the grand jurors disagree with a proposed prosecution.

19      Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred

20  to an instance in the grand juror selection process in which he excused three potential jurors.  See id. at 8.

21

22  _____

23      [1]  See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v.
        Navarro-Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-
24      Vargas II); United States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I);
        United States v. Marcucci, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

25

26      [2]  The transcript of the voir dire indicates that grand jurors were shown a video presentation
        on the role of the grand jury.  Mr. Heron-Salinas requests that the video presentation be produced.
27      See United States v. Alter, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he proceedings before the
        grand jury are secret, but the ground rules by which the grand jury conducts those proceedings are
28      not.").

    [3]  See also id. at 20 ("You're all about probable cause.").

1
2
> I've gone over this with a couple of people. You understood from the questions and answers that a couple of people were excused, I think three in this case, because they could not adhere to the principle that I'm about to tell you.

3 Id. That "principle" was Judge Burns's discussion of the grand jurors' inability to give effect to their

4 disagreement with Congress. See id. at 8-9. Thus, Judge Burns not only instructed the grand jurors on his

5 view of their discretion; he enforced that view on pain of being excused from service as a grand juror.

6     Examination of the recently disclosed voir dire transcript, which contains additional instructions and

7 commentary in the form of the give and take between Judge Burns and various prospective grand jurors,

8 reveals how Judge Burns's emphasis of the singular duty to determine whether or not probable cause exists,

9 and his statement that grand jurors cannot judge the wisdom of the criminal laws enacted by Congress, merely

10 compounded an erroneous series of instructions already given to the grand jury venire. In one of his earliest

11 substantive remarks, Judge Burns makes clear that the grand jury's sole function is probable cause

12 determination.

13
14
> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed? And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"

15
16
> If the answer is "yes" to both of those, then the case should move forward. If the answer to either of the questions is "no," the grand jury should not hesitate and not indict.

17 See Ex. B at 8. In this passage, Judge Burns twice uses the term "should" in a context that makes clear that

18 the term is employed to convey instruction: "should" cannot reasonably be read to mean optional when it

19 addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was

20 committed" or if it has no "reasonable belief that the person that they propose that we indict committed the

21 crime."

22     Equally revealing are Judge Burns's interactions with two potential grand jurors who indicated that,

23 in some unknown set of circumstances, they might decline to indict even where there was probable cause.

24 Because of the redactions of the grand jurors' names, Mr. Heron-Salinas will refer to them by occupation.

25 One is a retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter

26 REA). The CSW indicated a view that no drugs should be considered illegal and that some drug prosecutions

27 were not an effective use of resources. See id. at 16. The CSW was also troubled by certain unspecified

28 immigration cases. See id.

1   Judge Burns made no effort to determine what sorts of drug and immigration cases troubled the CSW.

2   He never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this district,

3   such as drug smuggling cases and cases involving reentry after deportation and alien smuggling.  Rather, he

4   provided instructions suggesting that, in any event, any scruples CSW may have possessed were simply not

5   capable of expression in the context of grand jury service.

6   Now, the question is can you fairly evaluate [drug cases and immigration cases]?  Just as the
    defendant is ultimately entitled to a fair trial and the person that's accused is entitled to a fair
7   appraisal of the evidence of the case that's in front of you, so, too, is the United States entitled
    to a fair judgment.  If there's probable cause, then the case should go forward.  *I wouldn't want*
8   *you to say*, "well, yeah, there's probable cause, but I still don't like what our government is
    doing.  I disagree with these laws, so I'm not going to vote for it to go forward."  If that is your
9   frame of mind, the probably you shouldn't serve.  Only you can tell me that.

10  See id. at 16-17 (emphasis added).  Thus, without any sort of context whatsoever, Judge Burns let the grand

11  juror know that he would not want him or her to decline to indict in an individual case where the grand juror

12  "[didn't] like what our government is doing," see id. at 17, but in which there was probable cause.  See id.

13  Such a case "should go forward."  See id.  Given that blanket proscription on grand juror discretion, made

14  manifest by Judge Burns's use of the pronoun "I", the CSW indicated that it "would be difficult to support a

15  charge even if [the CSW] thought the evidence warranted it."  See id.  Again, Judge Burns's question provided

16  no context; he inquired regarding "a case," a term presumably just as applicable to possession of a small

17  amount of medical marijuana as kilogram quantities of methamphetamine for distribution.  Any grand juror

18  listening to this exchange could only conclude that there was *no* case in which Judge Burns would permit

19  them to vote "no bill" in the face of a showing probable cause.

20  Just in case there may have been a grand juror that did not understand his or her inability to exercise

21  anything like prosecutorial discretion, Judge Burns drove the point home in his exchange with REA.  REA

22  first advised Judge Burns of a concern regarding the "disparity between state and federal law" regarding

23  "medical marijuana."  See id. at 24.  Judge Burns first sought to address REA's concerns about medical

24  marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty

25  considerations into account.

26  Well, those things -- the consequences of your determination shouldn't concern you in the
    sense that penalties or punishment, things like that -- we tell trial jurors, of course, that they
27  cannot consider the punishment or the consequence that Congress has set for these things.
    We'd ask you to also abide by that.  We want you to make a business-like decision of whether
28  there was a probable cause. . . .

07CR2872-JM

1  Id. at 24-25.  Having stated that REA was to "abide" by the instruction given to trial jurors, Judge Burns went

2  on to suggest that REA recuse him or herself from medical marijuana cases.  See id. at 25.

3        In response to further questioning, REA disclosed REA's belief "that drugs should be legal." See id.

4  That disclosure prompted Judge Burns to begin a discussion that ultimately led to an instruction that a grand

5  juror is obligated to vote to indict if there is probable cause.

6        I can tell you sometimes I don't agree with some of the legal decisions that are indicated that
       I have to make.  But my alternative is to vote for someone different, vote for someone that
7      supports the policies I support and get the law changed.  It's not for me to say, "well, I don't
       like it.  So I'm not going to follow it here."

8

9      You'd have a similar obligation as a grand juror even though you might have to grit your teeth
       on some cases.  Philosophically, if you were a member of congress, you'd vote against, for
       example, criminalizing marijuana.  I don't know if that's it, but you'd vote against

10     criminalizing some drugs.

11     That's not what your prerogative is here.  You're prerogative instead is to act like a judge and
       say, "all right.  This is what I've to deal with objectively.  Does it seem to me that a crime was
12     committed?  Yes.  Does it seem to me that this person's involved?  It does." *And then your
       obligation, if you find those to be true, would be to vote in favor of the case going forward.*

13

14  Id. at 26-27 (emphasis added).  Thus, the grand juror's duty is to conduct a simple two part test, which, if both

15  questions are answered in the affirmative, lead to an "obligation" to indict.

16        Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that

17  paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the obligation

18  to indict in every case in which there was probable cause.

19     The Court:    Do you think you'd be inclined to let people go in drug cases even though you
                    were convinced there was probable cause they committed a drug offense?
20
       REA:         It would depend on the case.
21
       The Court:    Is there a chance that you would do that?
22
       REA:         Yes.
23
       The Court:    I appreciate your answers.  I'll excuse you at this time.
24

25  Id. at 27.  Two aspects of this exchange are crucial.  First, REA plainly does not intend to act solely on his

26  political belief in decriminalization -- whether he or she would indict "depend[s] on the case," see id., as it

27  should.  Because REA's vote "depend[s] on the case," see id., it is necessarily true that REA would vote to

28  indict in some (perhaps many or even nearly all) cases in which there was probable cause.  Again, Judge

1   Burns made no effort to explore REA's views; he did not ascertain what sorts of cases would prompt REA

2   to hesitate.  The message is clear: it does not matter what type of case might prompt REA's reluctance to

3   indict because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going

4   forward."[4]  See id. at 27.  That is why even the "chance," see id., that a grand juror might not vote to indict

5   was too great a risk to run.

6       **2.      The Instructions Posit a Non-Existent Prosecutorial Duty to Offer
            Exculpatory Evidence.**

7

8           In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the

9   grand jurors that prosecutors would present to them evidence that tended to undercut probable cause.  See

10  Ex. A at 20.[5]

11  _____

12      [4] This point is underscored by Judge Burns's explanation to the Grand Jury that a magistrate
    judge will have determined the existence of probable cause "in most circumstances" before it has

13  been presented with any evidence.  See Ex. A at 6.  This instruction created an imprimatur of finding

14  probable cause in each case because had a magistrate judge not so found, the case likely would not
    have been presented to the Grand Jury for indictment at all.  The Grand Jury was informed that it

15  merely was redundant to the magistrate court "in most circumstances."  See id.  This instruction
    made the grand jury more inclined to indict irrespective of the evidence presented.

16

17      [5] These instructions were provided in the midst of several comments that praised the United
    States attorney's office and prosecutors in general.  Judge Burns advised the grand jurors that they

18  "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be
    honest, and . . . they'll act in good faith in all matters presented to you."  See Ex. A at 27.  The

19  instructions delivered during voir dire go even further.  In addressing a prospective grand juror who
    revealed "a strong bias for the U.S. Attorney, whatever cases they might bring," see Ex. B at 38,

20  Judge Burns affirmatively endorsed the prospective juror's view of the U.S. Attorney's office, even
    while purporting to discourage it: "frankly, I agree with the things you are saying.  They make sense

21  to me."  See id. at 43.  See also id. at 40 ("You were saying that you give a presumption of good
    faith to the U.S. Attorney and assume, quite logically, that they're not about the business of trying

22  to indict innocent people or people that they believe to be innocent or the evidence doesn't
    substantiate the charges against.").

23

24      Judge Burns's discussion of his once having been a prosecutor before the Grand Jury

25  compounded the error inherent in his praising of the government attorneys.  See Ex. A at 9-10.
    Judge Burns's instructions implied that as a prior prosecutor and current "jury liaison judge," see id.

26  at 8, he would not allow the government attorneys to act inappropriately or to present cases for
    indictment where no probable cause existed.

27

28      In addition, while Judge Burns instructed the Grand Jury that it had the power to question
    witnesses, Judge Burns's instructions also told the Grand Jury that it should "be deferential to the
    U.S. Attorney if there is an instance where the U.S. Attorney thinks a question ought not to be

1  Now, again, this emphasizes the difference between the function of the grand jury and the trial
2  jury. You're all about probable cause. If you think that there's evidence out there that might
   cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to
3  hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound*
   *to present evidence that cuts against what they may be asking you to do if they're aware of*
   *that evidence.*
4

5  Id. (emphasis added).

6      The antecedent to this instruction is also found in the voir dire. After advising the grand jurors that

7  "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14, Judge Burns

8  gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball. If there's something

9  adverse or that cuts against the charge, you'll be informed of that. They have a duty to do that." See id.

10 Thus, Judge Burns unequivocally advised the grand jurors that the government would present any evidence

11 that was "adverse" or "that cuts against the charge." See id.

12 **B.    *Navarro-Vargas* Establishes Limits on the Ability of Judges to Constrain the Powers of
       the Grand Jury, Which Judge Burns Far Exceeded in His Instructions as a Whole
13     During Impanelment.**

14     The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to

15 grand jurors in the Southern District of California. See Navarro-Vargas II, 408 F.3d 1184. While the Ninth

16 Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic

17 approach[6] to the problems posed by the instructions, endorsed many of the substantive arguments raised by

18 the defendants in those cases. The district court's instructions cannot be reconciled with the role of the grand

19 jury as set forth in Navarro-Vargas II. Taken together, the voir dire of and instructions given to the January

20 2007 Grand Jury, go far beyond those at issue in Navarro-Vargas, taking a giant leap in the direction of a

21 bureaucratic, deferential grand jury, focused solely upon probable cause determinations and utterly unable

22 _____

23 asked." See Ex. B at 12. As the dissent in Navarro-Vargas pointed out, "the grand jury's
   independence is diluted by [such an] instruction, which encourages deference to prosecutors."
24 Navarro-Vargas, 408 F.3d at 1215. The judge's admonition that his statement was only "advice,"
   see Ex. A at 12, does not cure the error as courts regularly presume grand jurors follow instructions
25 provided to them by the court. See id. at 1202, n.23 ("We must presume that grand jurors will
   follow instructions because, in fact, we are prohibited from examining jurors to verify whether they
26 understood the instruction as given and then followed it.").

27     [6] See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the
28 majority because "[t]he instruction's use of the word 'should' is most likely to be understood as
   imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's
   constitutional independence.").

1  to exercise any quasi-prosecutorial discretion.  That is not the institution the Framers envisioned.  See United

2  States v. Williams, 504 U.S. 36, 49 (1992).

3      For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas

4  II majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in

5  deciding whether a particular prosecution shall be instituted or followed up, performs much the same function

6  as a grand jury.'"  Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478, 510

7  (1978).  Accord United States v. Navarro-Vargas, 367 F.3d 896, 900 (9th Cir. 2004) (Navarro-Vargas

8  I)(Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as

9  prosecutorial." ).  See also Navarro-Vargas II, 408 F.3d at 1213 (Hawkins, J., dissenting).  It recognizes that

10 the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, id., but

11 also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted by the

12 prosecutor."  Id.  See Niki Kuckes, The Democratic Prosecutor:  Explaining the Constitutional Function of

13 the Federal Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was

14 "'arguably . . . the most important attribute of grand jury review from the perspective of those who insisted

15 that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal Procedure

16 § 15.2(g) (2d ed. 1999)).

17     Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes set forth

18 in Vasquez v. Hillery, 474 U.S. 254 (1986).  See id.

19     The grand jury thus determines not only whether probable cause exists, but also whether to
       "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps
20     most significant of all, a capital offense or a non-capital offense -- all on the basis of the same
       facts.  And, significantly, the grand jury may refuse to return an indictment even "'where a
21     conviction can be obtained.'"

22 Id. (quoting Vasquez, 474 U.S. at 263).  The Supreme Court has itself reaffirmed Vasquez's description of

23 the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand jury "controls

24 not only the initial decision to indict, but also significant questions such as how many counts to charge and

25 whether to charge a greater or lesser offense, including the important decision whether to charge a capital

26 crime."  Id. at 399 (citing Vasquez, 474 U.S. at 263).  Judge Hawkins notes that the Navarro-Vargas II

27 majority accepts the major premise of Vasquez: "the majority agrees that a grand jury has the power to refuse

28 to indict someone even when the prosecutor has established probable cause that this individual has committed

a crime."  See id. at 1214 (Hawkins, J. dissenting).  Accord Navarro-Vargas I, 367 F.3d at 899 (Kozinski, J.,

1 dissenting); United States v. Marcucci, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam) (Hawkins, J.,

2 dissenting).  In short, the grand jurors' prerogative not to indict enjoys strong support in the Ninth Circuit.

3 But not in Judge Burns's instructions.

4 **C.     Judge Burns's Instructions Forbid the Exercise of Grand Jury Discretion Established**
     **in Both _Vasquez_ and _Navarro-Vargas II_.**

5

6       The Navarro-Vargas II majority found that the instruction in that case "leave[s] room for the grand

7 jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous

8 decision in Marcucci.  Marcucci reasoned that the instructions do not mandate that grand jurors indict upon

9 every finding of probable cause because the term "should" may mean "what is probable or expected."  299

10 F.3d at 1164 (citation omitted).  That reading of the term "should" makes no sense in context, as Judge

11 Hawkins ably pointed out.  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The

12 instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or

13 obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").  See also

14 id. ("The 'word' should is used to express a duty [or] obligation.") (quoting The Oxford American Diction and

15 Language Guide 1579 (1999) (brackets in original)).

16       The debate about what the word "should" means is irrelevant here; the instructions here make no such

17 fine distinction.  The grand jury instructions make it painfully clear that grand jurors simply may not choose

18 not to indict in the event of what appears to them to be an unfair application of the law: should "you disagree

19 with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting

20 even though I think that the evidence is sufficient'...."  See Ex. B at 8-9.  Thus, the instruction flatly bars the

21 grand jury from declining to indict because they disagree with a proposed prosecution. No grand juror would

22 read this language as instructing, or even allowing, him or her to assess "the need to indict."  Vasquez, 474

23 U.S. at 264.

24       While Judge Burns used the word "should" instead of "shall" during voir dire with respect to whether

25 an indictment was required if probable cause existed, see Ex. B at 4, 8, in context, it is clear that he could only

26 mean "should" in the obligatory sense.  For example, when addressing a prospective juror, Judge Burns not

27 only told the jurors that they "should" indict if there is probable cause, he told them that if there is not

28 probable cause, "then the grand jury should hesitate and not indict."  See id. at 8.  At least in context, it would

strain credulity to suggest that Judge Burns was using "should" for the purpose of "leaving room for the grand

17                                                              07CR2872-JM

1  jury to [indict] even if it finds [no] probable cause." <u>See</u> <u>Navarro-Vargas</u>, 408 F.3d at 1205.  Clearly he was

2  not.

3          The full passage cited above effectively eliminates any possibility that Judge Burns intended the

4  <u>Navarro-Vargas</u> spin on the word "should."

5          [T]he grand jury is determining really two factors: "do we have a reasonable belief that a
           crime was committed?  And second, do we have a reasonable belief that the person that they
6          propose that we indict committed the crime?"

7          If the answer is "yes" to both of those, then the case should move forward.  If the answer to
           either of the questions is "no," then the grand jury should not hesitate and not indict.

8

9  <u>See</u> Ex. B at 8.  Of the two sentences containing the word "should," the latter of the two essentially states that

10 if there is no probable cause, you *should* not indict.  Judge Burns could not possibly have intended to "leav[e]

11 room for the grand jury to [indict] even if it finds [no] probable cause."  <u>See</u> <u>Navarro-Vargas</u>, 408 F.3d at

12 1205 (citing <u>Marcucci</u>, 299 F.3d at 1159).  That would contravene the grand jury's historic role of protecting

13 the innocent.   <u>See, e.g.</u>, <u>United States v. Calandra</u>, 414 U.S. 338, 343 (1974) (The grand jury's

14 "responsibilities continue to include both the determination whether there is probable cause and the protection

15 of citizens against unfounded criminal prosecutions.") (citation omitted).

16          By the same token, if Judge Burns said that "the case should move forward" if there is probable cause,

17 but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," <u>see</u> <u>Navarro-</u>

18 <u>Vargas</u>, 408 F.3d at 1205 (citing <u>Marcucci</u>, 299 F.3d at 1159), then he would have to have intended two

19 different meanings of the word "should" in the space of two consecutive sentences.  That could not have been

20 his intent.  But even if it were, no grand jury could ever have had that understanding.[7]  Jurors are not

21 presumed to be capable of sorting through internally contradictory instructions.  <u>See generally</u> <u>United States</u>

22 <u>v. Lewis</u>, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot

23 presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

24          Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it explicitly

25 clear to the grand jurors that "should" was not merely suggestive, but obligatory:

26

27          [7]    This argument does not turn on Mr. Heron-Salinas's view that the <u>Navarro-</u>
28 <u>Vargas</u>/<u>Marcucci</u> reading of the word "should" in the model instructions is wildly implausible.
   Rather, it turns on the context in which the word is employed by Judge Burns in his unique
   instructions, context which eliminates the <u>Navarro-Vargas</u>/<u>Marcucci</u> reading as a possibility.

07CR2872-JM

**(1)**     The first occasion occurred in the following exchange when Judge Burns conducted voir dire and excused a potential juror (CSW):

| | |
|---|---|
| The Court: | . . . If there's probable cause, then the case should go forward. I wouldn't want you to say, "Well, yeah, there's probable cause. But I still don't like what the government is doing. I disagree with these laws, so I'm not going to vote for it to go forward." If that's your frame of mind, then probably you shouldn't serve. Only you can tell me that. |
| Prospective Juror: | Well, I think I may fall in that category. |
| The Court: | In the latter category? |
| Prospective Juror: | Yes. |
| The Court: | Where it would be difficult for you to support a charge even if you thought the evidence warranted it? |
| Prospective Juror: | Yes. |
| The Court: | I'm going to excuse you then. |

See Ex. B at 17. There was nothing ambiguous about the word "should" in this exchange with a prospective juror. Even if the prospective juror did not like what the government was doing in a particular case, that case "should go forward" and Judge Burns expressly disapproved of any vote that might prevent that. See id. ("I wouldn't want you [to vote against such a case]"). The sanction for the possibility of independent judgment was dismissal, a result that provided full deterrence of that juror's discretion and secondary deterrence as to the exercise of discretion by any other prospective grand juror.

**(2)**     In an even more explicit example of what "should" meant, Judge Burns makes clear that it there is an unbending obligation to indict if there is probable cause. Grand jurors have no other prerogative.

Court   . . . It's not for me to say, "Well, I don't like it. So I'm not going to follow it here."

You'd have a similar *obligation* as a grand juror even though you might have to grit your teeth on some cases. Philosophically, if you were a member of Congress, you'd vote against, for example, criminalizing marijuana. I don't know if that's it, but you'd vote against criminalizing some drugs.

That's not what your *prerogative* is here. Your prerogative instead is act like a judge and to say, "All right. This is what I've got to deal with objectively. Does it seem to me that a crime was committed? Yes. Does it seem to me that this person's involved? It does." *And then your obligation, if you find those things to be true, would be to vote in favor of the case going forward*.

Id. at 26-27 (emphasis added). After telling this potential juror (REA) what his obligations and prerogatives

were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even though you were convinced there was probable cause they committed a drug offense?" Id. at 27.  The potential juror responded: "It would depend on the case." Id.  Nevertheless, that juror was excused.  Id. at 28.  Again, in this context, and contrary to the situation in Navarro-Vargas, "should" means "shall"; it is obligatory, and the juror has no prerogative to do anything other than indict if there is probable cause.

Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes a particular law to be "unwise."  This juror said that any decision to indict would not depend on the law, but rather it would "depend on the case."  Thus, it is clear that Judge Burns's point was that if a juror could not indict on probable cause for *every* case, then that juror was not fit for service.  It is equally clear that the prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual scenarios, perhaps many.  But Judge Burns did not pursue the question of what factual scenarios troubled the prospective jurors, because his message is that there is no discretion not to indict.

**(3)**    As if the preceding examples were not enough, Judge Burns continued to pound the point home that "should" meant "shall" when he told another grand juror during voir dire: "[W]hat I have to insist on is that you follow the law that's given to us by the United States Congress.  We enforce the federal laws here." See id. at 61.

**(4)**    And then again, after swearing in all the grand jurors who had already agreed to indict in every case where there was probable cause, Judge Burns reiterated that "should" means "shall" when he reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient . . . . Instead your *obligation* is . . . not to bring your personal definition of what the law ought to be and try to impose that through applying it in a grand jury setting." See Ex. A at 9.

Moreover, Judge Burns advised the grand jurors that the were forbidden from considering the penalties to which indicted persons may be subject.

| Prospective Juror (REA): | ... And as far as being fair, it kind of depends on what the case is about because there is a disparity between state and federal law. |
|---|---|
| The Court: | In what regard? |
| Prospective Juror: | Specifically, medical marijuana. |

| | |
|---|---|
| 1 | The Court:    Well, those things -- the consequences of your determination |
| 2 | shouldn't concern you in the sense that penalties or punishment, things like that -- *we tell trial jurors, of course, that they* |
| 3 | *cannot consider the punishment or the consequence that Congress has set for these things. We'd ask you to also abide* |
| 4 | *by that.*  We want you to make a business-like decision of whether there was a probable cause. ... |

5  See Ex. A at 24-25 (emphasis added).  A "business-like decision of whether there was a probable cause"

6  would obviously leave no role for the consideration of penalty information.

7      The Ninth Circuit previously rejected a claim based upon the proscription against consideration of

8  penalty information based upon the same unlikely reading of the word "should" employed in Marcucci.  See

9  United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006).  Cortez-Rivera is inapposite for two

10  reasons.  First, Judge Burns did not use the term "should" in the passage quoted above.  Second, that context,

11  as well as his consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there

12  ever was any) relied upon by Cortez-Rivera.  The instructions again violate Vasquez, which plainly

13  authorized consideration of penalty information.  See 474 U.S. at 263.

14      Nothing can mask the undeniable fact that Judge Burns explicitly instructed the jurors time and time

15  again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there

16  was probable cause.  These instructions go far beyond the holding of Navarro-Vargas and stand in direct

17  contradiction of the Supreme Court's decision in Vasquez.  Indeed, it defies credulity to suggest that a grand

18  juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court held in

19  Vasquez:

| | |
|---|---|
| 20 | The grand jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not.  In the hands of the grand jury lies the power to charge |
| 21 | a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense – all on the basis of the same facts. |
| 22 | Moreover, "[t]he grand jury is not bound to indict in every case where a conviction can be obtained." |
| 23 | |

24  474 U.S. at 263 (quoting United States v. Ciambrone, 601 F.2d 616, 629 (2d Cir. 1979) (Friendly, J.,

25  dissenting)); accord Campbell v. Louisiana, 523 U.S. 392, 399 (1998) (The grand jury "controls not only the

26  initial decision to indict, but also significant decisions such as how many counts to charge and whether to

27  charge a greater or lesser offense, including the important decision whether to charge a capital crime.").  Nor

28  would the January 2007 grand jury ever believe that it was empowered to assess the "the need to indict." See

1  id. at 264.  Judge Burns's grand jury is not Vasquez's grand jury.  The instructions therefore represent

2  structural constitutional error "that interferes with the grand jury's independence and the integrity of the grand

3  jury proceeding."  See United States v. Isgro, 974 F.2d 1091, 1094 (9th Cir. 1992).  The indictment must

4  therefore be dismissed.  Id.

5      The Navarro-Vargas II majority's faith in the structure of the grand jury *is not* a cure for the

6  instructions excesses.  The Navarro-Vargas II majority attributes "[t]he grand jury's discretion -- its

7  independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its

8  decisions."  408 F.3d at 1200.  As a result, the majority discounts the effect that a judge's instructions may

9  have on a grand jury because "it is the *structure* of the grand jury process and its *function* that make it

10  independent."  Id. at 1202 (emphases in the original).

11      Judge Hawkins sharply criticized this approach.  The majority, he explains, "believes that the

12  'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability

13  of many of its decisions -- sufficiently protects that power."  See id. at 1214 (Hawkins, J., dissenting).  The

14  flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond

15  making a probable cause determination ... unconstitutionally undermines the very structural protections that

16  the majority believes save[] the instruction."  Id.  After all, it is an "'almost invariable assumption of the law

17  that jurors follow their instructions.'"  Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)).  If that

18  "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described

19  in Vasquez.  Indeed, "there is something supremely cynical about saying that it is fine to give jurors erroneous

20  instructions because nothing will happen if they disobey them."  Id.

21      In setting forth Judge Hawkins' views, Mr. Heron-Salinas understands that this Court may not adopt

22  them solely because the reasoning that supports them is so much more persuasive than the majority's

23  sophistry.  Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.

24      Here, again, the question is not an obscure interpretation of the word "should", especially in light of

25  the instructions and commentary by Judge Burns during voir dire discussed above - unaccounted for by the

26  Court in Navarro-Vargas II because they had not yet been disclosed to the defense, but an absolute ban on

27  the right to refuse to indict that directly conflicts with the recognition of that right in Vasquez, Campbell, and

28  both Navarro-Vargas II opinions.  Navarro-Vargas II is distinguishable on that basis, but not only that.

1    Judge Burns did not limit himself to denying the grand jurors the power that <u>Vasquez</u> plainly states

2  they enjoy.  He also excused prospective grand jurors who might have exercised that Fifth Amendment

3  prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle...."  <u>See</u>

4  Ex. A at 8; Ex. B at 17, 28.  The structure of the grand jury and the secrecy of its deliberations cannot

5  embolden grand jurors who are no longer there, likely because they expressed their willingness to act as the

6  conscience of the community.  <u>See</u> <u>Navarro-Vargas II</u>, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a grand

7  jury exercising its powers under <u>Vasquez</u> "serves ... to protect the accused from the other branches of

8  government by acting as the 'conscience of the community.'") (quoting <u>Gaither v. United States</u>, 413 F.2d

9  1061, 1066 &  n.6 (D.C. Cir. 1969)).  The federal courts possess only "very limited" power "to fashion, on

10  their own initiative, rules of grand jury procedure," <u>United States v. Williams</u>, 504 U.S. 36, 50 (1992), and,

11  here, Judge Burns has both fashioned his own rules and enforced them.

12  **D.    <u>The Instructions Conflict with <em>Williams'</em> Holding That There Is No Duty to Present
         Exculpatory Evidence to the Grand Jury</u>.**

13

14    In <u>Williams</u>, the defendant, although conceding that it was not required by the Fifth Amendment,

15  argued that the federal courts should exercise their supervisory power to order prosecutors to disclose

16  exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment

17  common law.  <u>See</u> 504 U.S. at 45, 51.  <u>Williams</u> held that "as a general matter at least, no such 'supervisory'

18  judicial authority exists."  <u>See</u> <u>id.</u> at 47.  Indeed, although the supervisory power may provide the authority

19  "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct

20  amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this

21  Court and by Congress to ensure the integrity of the grand jury's functions,'" <u>id.</u> at 46 (citation omitted), it

22  does not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance."  <u>Id.</u>

23  at 47 (emphasis added).  The federal courts possess only "very limited" power "to fashion, on their own

24  initiative, rules of grand jury procedure."  <u>Id.</u> at 50.  As a consequence, <u>Williams</u> rejected the defendant's

25  claim, both as an exercise of supervisory power and as Fifth Amendment common law.  <u>See</u> <u>id.</u> at 51-55.

26    Despite the holding in <u>Williams</u>, the instructions here assure the grand jurors that prosecutors would

27  present to them evidence that tended to undercut probable cause.  <u>See</u> Ex. A at 20.

28

1    Now, again, this emphasizes the difference between the function of the grand jury and the trial
2    jury.  You're all about probable cause.  If you think that there's evidence out there that might
     cause you say "well, I don't think probable cause exists," then it's incumbent upon you to hear
3    that evidence as well.  As I told you, in most instances, *the U.S. Attorneys are duty-bound to
     present evidence that cuts against what they may be asking you to do if they're aware of that
     evidence.*

4

5    Id. (emphasis added).  Moreover, the district court later returned to the notion of the prosecutors and their

6    duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of

7    [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you."  See

8    id. at 27.  The Ninth Circuit has already concluded it is likely this final comment is "unnecessary."  See

9    Navarro-Vargas, 408 F.3d at 1207.

10        This particular instruction has a devastating effect on the grand jury's protective powers, particularly

11   if it is not true.  It begins by emphasizing the message that Navarro-Vargas II somehow concluded was not

12   conveyed by the previous instruction: "You're all about probable cause."  See Ex. A at 20.  Thus, once again,

13   the grand jury is reminded that they are limited to probable cause determinations (a reminder that was

14   probably unnecessary in light of the fact that Judge Burns had already told the grand jurors that they likely

15   would be excused if they rejected this limitation).  The instruction goes on to tell the grand jurors that they

16   should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor

17   will present it.  The end result, then, is that grand jurors should consider evidence that goes against probable

18   cause, but, if none is presented by the government, they can  presume that there is none.  After all, "in most

19   instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking

20   you to do if they're aware of that evidence."  See id.  Moreover, during voir dire, Judge Burns informed the

21   jurors that "my experience is that the prosecutors don't play hide-the-ball.  If there's something adverse or that

22   cuts against the charge, you'll be informed of that.  *They have a duty to do that*."  See Ex. B at 14-15

23   (emphasis added).  Thus, if the exculpatory evidence existed, it necessarily would have been presented by

24   the "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear

25   in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to

26   you."  See Ex. A at 27.

27   //

28   //

1   These instructions create a presumption that, in cases where the prosecutor does not present

2 exculpatory evidence, no exculpatory evidence exists.  A grand juror's reasoning, in a case in which no

3 exculpatory evidence was presented, would proceed along these lines:

4       (1)     I have to consider evidence that undercuts probable cause.

5       (2)     The candid, honest, duty-bound prosecutor would, in good faith, have presented any such

6               evidence to me, if it existed.

7       (3)     Because no such evidence was presented to me, I may conclude that there is none.

8 Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the evidence

9 presented represents the universe of all available exculpatory evidence; if there was more, the duty-bound

10 prosecutor would have presented it.

11      The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the

12 prosecutor would present it, so investigation is a waste of time -- and provide additional support to every

13 probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side

14 of the equation because it was not presented.  A grand jury so badly misguided is no grand jury at all under

15 the Fifth Amendment.

16                                          **IV.**

17                      **<u>MOTION FOR LEAVE TO FILE ADDITIONAL MOTIONS</u>**

18      Defense counsel has received 69 pages of discovery and a DVD in this case.  That discovery was

19 received one business day before defense counsel left town for a one-week training program, during which

20 time pretrial motions were due.  As a result, defense counsel has not had an opportunity to discuss the

21 discovery received with Mr. Heron-Salinas prior to filing these motions.  Nor has defense counsel yet

22 received Mr. Heron-Salinas's A-file or copies of the audiotapes of his removal hearing(s).  As information

23 comes to light, due to the government providing additional discovery in response to these motions or an order

24 of this Court, Mr. Heron-Salinas may find it necessary to file further motions.  It is, therefore, requested that

25 defense counsel be allowed the opportunity to file further motions based upon information gained through

26 the discovery process.

27 //

28 //

## V.

### CONCLUSION

For the foregoing reasons, Mr. Heron-Salinas respectfully requests that the Court grant the above motions.

Respectfully submitted,


DATED:          November 15, 2007                    /s/ Jennifer L. Coon
                                                     JENNIFER L. COON
                                                     Federal Defenders of San Diego, Inc.
                                                     Attorneys for Mr. Heron-Salinas

1

## CERTIFICATE OF SERVICE

2          Counsel for Defendant certifies that the foregoing pleading is true and accurate to the best of her

3   information and belief, and that a copy of the foregoing document has been served this day upon:

4   **Nicole A Jones**
    Nicole.Jones@usdoj.gov,leticia.granada@usdoj.gov,efile.dkt.gc1@usdoj.gov
5

6   Dated: November 15, 2007                         ____/s/ Jennifer L. Coon____
                                                     JENNIFER L. COON
7                                                    Federal Defenders of San Diego, Inc.
                                                     225 Broadway, Suite 900
8                                                    San Diego, CA 92101-5030
                                                     (619) 234-8467  (tel)
9                                                    (619) 687-2666  (fax)
                                                     e-mail: Jennifer_Coon@fd.org
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28